# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ETHEL LUVENE ROSE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | Civil Action No. 2:13cv00051 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I.  Background and Standard of Review*

Plaintiff, Ethel Luvene Rose, ("Rose"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

Case 2:13-cv-00051-JPJ-PMS   Document 17   Filed 02/25/15   Page 1 of 28   Pageid#: 386

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Rose protectively filed her application[1] for SSI on May 12, 2010, alleging disability as of May 15, 2009, due to anxiety, depression, crying spells, hypertension, back problems, hip problems and high cholesterol. (Record, ("R."), at 14, 134-37, 146, 150, 167, 183.) The claim was denied initially and on reconsideration. (R. at 84-86, 89, 94-96, 98-100.) Rose then requested a hearing before an administrative law judge, ("ALJ"). (R. at 101-02.) The hearing was held on May 15, 2012, at which Rose was represented by counsel. (R. at 27-58.)

By decision dated June 27, 2012, the ALJ denied Rose's claim. (R. at 14-22.) The ALJ found that Rose had not engaged in substantial gainful activity since May 19, 2010, the date of her application. (R. at 16.) The ALJ determined that the medical evidence established that Rose suffered from severe impairments, including major depressive disorder; generalized anxiety disorder; social phobia; borderline intellectual functioning; and a personality disorder, but he found that Rose did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-18.) The ALJ found that Rose had the residual functional capacity to perform a full range of work at all exertional levels with certain nonexertional limitations. (R. at 18-21.) In particular, he found that Rose could perform simple, routine and

---

[1] Rose also filed an application for disability insurance benefits, ("DIB"), but it was determined that she did not qualify for such benefits because she had not worked long enough. (R. at 81-83.)

repetitive tasks in a work environment where changes occur no more than occasionally and where there is no greater than occasional interaction with co-workers and the general public. (R. at 18.) The ALJ found that Rose had no past relevant work. (R. at 21.) Based on Rose's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Rose could perform jobs existing in significant numbers in the national economy, including jobs as a dishwasher, a housekeeper and a small products assembler. (R. at 21-22.) Therefore, the ALJ found that Rose was not under a disability as defined under the Act and was not eligible for benefits. (R. at 22.) *See* 20 C.F.R. § 416.920(g) (2014).

After the ALJ issued his decision, Rose pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-5.) Rose then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2014). The case is before this court on Rose's motion for summary judgment filed May 7, 2014, and the Commissioner's motion for summary judgment filed June 9, 2014.

## II. Facts[2]

Rose was born in 1960, (R. at 21), which, at the date of her application, classified her as a "younger person" under 20 C.F.R. § 416.963(c). By the time of

---

[2] Rose does not challenge the ALJ's findings with respect to her alleged physical impairments. Therefore, the discussion of the medical evidence will be limited to those records pertaining to Rose's mental health. Further, the undersigned's consideration of medical records is limited to those pertinent to the relevant time period of May 15, 2009, the alleged disability onset date, through July 27, 2012, the date of the ALJ's decision. To the extent that medical records pertaining to dates not pertinent to the relevant time period are contained herein, it is for clarity of the record.

the ALJ's decision, Rose had turned 52 years old, which classified her as a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d). She has a high school education and no past work experience. (R. at 150-51.) Rose testified that both of her sons, the youngest of whom lived with her, had Asperger Syndrome.[3] (R. at 33.) Rose testified that she had not worked since her alleged date of disability and that she was uninsured. (R. at 35-36.) She testified that she suffered from depression, but was not taking any medication because her doctor stopped it due to a possible allergic reaction. (R. at 38.) Rose acknowledged that the medication helped her. (R. at 38.) She stated that she no longer was receiving counseling or seeing a psychiatrist due to a lack of insurance. (R. at 45.) She estimated that she received such services for about a year. (R. at 45.) Rose testified that she had crying spells and panic attacks and that, on occasion, she had difficulty being around people. (R. at 39-40.) However, she stated that she had one "real good friend" with whom she would go to the movies and out to eat approximately weekly. (R. at 40.) Rose further testified that she sometimes had problems with her memory and concentration. (R. at 40.)

Rose testified that on a good day, she could dust, mop and vacuum and complete her housework in her two-story home. (R. at 41, 47.) She stated that she cooked daily and washed dishes. (R. at 47.) Rose testified that her oldest son took her grocery shopping and helped at times. (R. at 43.) Rose testified that she watched television, read, attended church on occasion with a friend and talked a lot with her sister on the phone. (R. at 44, 47-48.) She further testified that she cared

---

[3] Asperger Syndrome is an autism spectrum disorder considered to be on the high functioning end of the spectrum. Affected individuals have difficulty with social interactions and exhibit a restricted range of interests and/or repetitive behaviors, and motor development may be delayed. *See* http://www.autismspeaks.org/what-autism/asperger-syndrome (last visited Feb. 25, 2015).

for her four cats. (R. at 49.) She stated that, on a bad day, which she estimated she had two or three weekly, she would simply lie down to rest her eyes, due to headaches and sluggishness from poor sleep or bad dreams, which led to depression. (R. at 42.) Rose stated that she enjoyed painting pictures in the past, but could no longer do so due to intermittent hand tremors. (R. at 43.)

Bonnie Ward, a vocational expert, also was present and testified at Rose's hearing. (R. at 52-57.) Ward was asked to consider a hypothetical individual of Rose's age, education and work experience who could perform simple, routine and repetitive tasks in a work environment where changes occurred no more than occasionally and where there was no more than occasional interaction with the general public or with co-workers. (R. at 54.) Ward testified that such an individual could perform the jobs of a dishwasher, a hand packer and a laundry worker, all at the medium[4] level of exertion, as well as the jobs of a housekeeper, a small product assembler and an electrical assembler, all at the light[5] level of exertion and all existing in significant numbers in the national economy. (R. at 54-55.) Ward further testified that the same hypothetical individual, but who would be off task as much as 15 percent of any given day in addition to regularly scheduled breaks, likely would be unable to perform the jobs enumerated, as they are production-quota driven. (R. at 56.) Ward also testified that the first hypothetical individual, but who would be absent or would be late to work an average of three days per month, would not be able to maintain employment. (R. at 56.)

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 416.1567(c) (2014).

[5] Light work involves lifting items weighing up to 25 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.1567(b) (2014).

5

In rendering his decision, the ALJ reviewed records from Family Preservation Services; Wise Medical Group; Solutions Counseling; Dr. Esther Adade, M.D.; D. Kaye Weitzman, L.C.S.W.; Mountain States Medical Group Behavioral Health; Dr. H. Brinker, M.D., a psychiatrist; Appalachian Healthcare Associates; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Bristol Regional Medical Center; Ridgeview at Bristol Regional Medical Center; Wise County Behavioral Health Services; Lee County Behavioral Health Services; Dr. Robert Keeley, M.D., a state agency physician; Jeanne Buyck, Ph.D., a state agency psychologist; Dr. John Sadler, M.D., a state agency physician; and Joseph Leizer, Ph.D., a state agency psychologist.

On April 22, 2010, Rose was assessed for intake at Family Preservation Services by Vivian Hall and R. McMurray, both licensed clinical social workers. (R. at 204-13.) Rose reported experiencing both depressive and anxiety symptoms for years. (R. 204.) She indicated then-current stressors to include her two sons' medical diagnoses and caring for her ailing mother. (R. at 204.) Rose reported that her sons' behavior had resulted in court service and social service involvement. (R. at 204.) She reported having no interpersonal relationships and self-isolation. (R. at 204.) Rose admitted to arguing and physically fighting with her youngest son, and she stated that her older son tried to "rule over" her. (R. at 207.) She described their daily functioning as living in "crisis mode." (R. at 207.) Her sons' biological father was deceased, and Rose had unresolved grief issues and guilt. (R. at 207.) On mental status examination, she had poor eye contact, agitated motor activity, inadequate impulse control, a poor self-concept, poor insight, appetite loss, sleeplessness and a depressed, anxious and agitated mood with a flat affect, but she was fully oriented, had logical thought associations, normal perceptions, fair concentration, intact memory and was self-deprecating and had poor but intact

6

judgment and coherent speech. (R. at 208-09.) Rose denied any then-current suicidal intent or plan or any intent or plan to harm others. (R. at 209.) She was diagnosed with major depression, severe, recurrent; social phobia; and generalized anxiety disorder; and her then-current Global Assessment of Functioning, ("GAF"),[6] score was placed at 49.[7] (R. at 209-10.) Counseling was recommended. (R. at 210.) On an Adult Needs And Strengths Assessment form, Dr. Ida Mullins, M.D., noted that Rose had severe problems with social functioning and recreational activities. (R. at 212.) Dr. Mullins further noted that Rose's depression and anxiety were causing severe/dangerous problems. (R. at 212.)

Rose presented to Wise Medical Group on May 12, 2010, to establish care. (R. at 218.) At that time, she noted that she had not seen a doctor in years. (R. at 218.) Rose reported a history of depression and hypertension. (R. at 218.) Her affect was deemed normal. (R. at 218.) The physician noted that she was not taking any medications for depression, and they would discuss her need for such as necessary. (R. at 218.) When she returned on June 11, 2010, she was doing well and voiced no complaints. (R. at 223.) Her affect again was deemed normal, and there was no further mention of Rose's psychological condition. (R. at 223.)

On June 16, 2010, Rose saw D. Kaye Weitzman, a licensed clinical social worker at Solutions Counseling, for an intake assessment. (R. at 234.) She reported experiencing depression her whole life, and she noted again her two sons with

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairments in social, occupational, or school functioning. …" DSM-IV at 32.

7

Asperger Syndrome. (R. at 234.) Rose reported that she worried a lot about her children and she stayed nervous often. (R. at 234.) She also reported that her husband died in 2004. (R. at 234.) On mental status examination, Rose was depressed and anxious with intact orientation and thought process and fair judgment/insight. (R. at 234.) She was diagnosed with major depressive disorder, recurrent, moderate; generalized anxiety disorder; and bereavement, uncomplicated; and her then-current GAF score was placed at 50. (R. at 234.) She was scheduled to begin cognitive, insight-oriented individual therapy every two weeks for 26 sessions. (R. at 234.) Rose returned to Weitzman on July 1, 2010, noting again that her children were her biggest concern. (R. at 235.) She reported moderate depression and anxiety, irritability/anger, crying spells and panic attacks, but she denied suicidal or homicidal ideations. (R. at 235.) Mental status examination revealed a depressed and irritable mood with an anxious, but appropriate, affect, intact orientation and thought process, transient paranoia/delusions and limited to fair judgment/insight. (R. at 235.) Weitzman noted a fair improvement in insight. (R. at 235.) However, she noted that Rose had not yet seen a physician to get a prescription for Paxil. (R. at 235.) She was diagnosed with adjustment disorder with mixed anxiety and depressed mood; and generalized anxiety disorder. (R. at 235.)

Rose returned to Wise Medical Group on July 13, 2010, for complaints of back pain. (R. at 245.) However, the physician also addressed Rose's depression by prescribing Celexa 10mg. (R. at 245.) The treatment note makes no other mention of Rose's psychological condition. (R. at 245.)

Jeanne Buyck, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on August 3, 2010, finding that Rose had no

restrictions in performing activities of daily living, moderate difficulties maintaining social functioning and maintaining concentration, persistence or pace and that she had experienced no repeated episodes of decompensation of extended duration. (R. at 62.) Buyck also completed a Mental Residual Functional Capacity Assessment, finding that Rose was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to respond appropriately to changes in the work setting. (R. at 63-65.) Buyck opined that Rose should be able to perform simple, unskilled, routine work. (R. at 64.)

When Rose returned to Wise Medical Group on August 13, 2010, she again reported doing well and voiced no concerns. (R. at 254.) Her affect was deemed normal, and her dosage of Celexa was increased. (R. at 254.) Rose returned to Weitzman on August 18, 2010, with continued claims of stress regarding her sons. (R. at 285.) She reported moderate depression, anxiety, irritability/anger, crying spells and panic attacks, but she denied suicidal or homicidal ideation. (R. at 285.) On mental status examination, Rose was depressed and anxious with an appropriate affect, intact thought process, transient paranoia/delusions and fair judgment and insight. (R. at 285.) Weitzman opined that she was maintaining progress. (R. at 285.) She diagnosed major depressive disorder, recurrent,

9

moderate; generalized anxiety disorder; and adjustment disorder with mixed anxiety and depressed mood. (R. at 285.) On September 12, 2010, Rose reported that she was very worried about her son who had gotten into some trouble at school. (R. at 284.) She reported moderate depression, anxiety, irritability/anger, crying spells and panic attacks, but she denied suicidal or homicidal ideations. (R. at 284.) On mental status examination, Rose was depressed and irritable with an anxious, but appropriate, affect. (R. at 284.) Orientation was intact, thought process was slowed, she had transient paranoia/delusions, and judgment/insight were fair. (R. at 284.) Weitzman diagnosed major depressive disorder, recurrent, moderate; generalized anxiety disorder; and bereavement, uncomplicated. (R. at 284.) On October 6, 2010, Rose reported doing fair, but noted increased worry about her youngest son, as people at school were trying to get him into trouble. (R. at 283.) She reported moderate depression, anxiety, irritability/anger, crying spells and panic attacks, but she denied suicidal or homicidal ideations. (R. at 283.) On mental status examination, Rose was depressed and irritable with an anxious affect, intact orientation and thought process, transient paranoia/delusions and fair judgment/insight. (R. at 283.) Weitzman noted that Rose was maintaining progress, but decompensated if her sons were not doing well. (R. at 283.) She diagnosed major depressive disorder, recurrent, moderate; generalized anxiety disorder; and counseling for parent-child problem, unspecified. (R. at 283.)

On October 8, 2010, Weitzman completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) of Rose. (R. at 292-94.) She concluded that Rose had no useful ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out simple, detailed and complex job instructions,

to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 292-93.) Weitzman further concluded that Rose would miss, on average, more than two workdays monthly due to her impairments or treatment. (R. at 294.)

On October 28, 2010, Rose presented to Mountain States Medical Group Behavioral Health, ("Mountain States"), with complaints of anxiety and depression. (R. at 298-300.) She reported increased anxiety and panic attacks. (R. at 298.) However, she denied suicidal or homicidal ideations, as well as psychotic or manic symptoms or episodes. (R. at 298.) Rose reported feeling stressed and overwhelmed by taking care of her son. (R. at 298.) She was taking Celexa 20 mg at that time. (R. at 298.) On mental status examination, Rose was cooperative with normal motor movements, soft speech, a depressed and stressed mood with a full affect, goal-directed thought process and fair insight/judgment. (R. at 299.) No delusions were noted. (R. at 299.) Dr. H. Brinker, M.D., a psychiatrist, diagnosed major depressive disorder and generalized anxiety disorder and assessed her then-current GAF score at 60.[8] (R. at 300.) Rose's Celexa dosage was doubled, and Trazodone was prescribed. (R. at 300.) Her prognosis was deemed good. (R. at 300.) Rose returned to Dr. Brinker on December 10, 2010, for psychotherapy. (R. at 297.) It was noted that Rose was compliant with treatment and/or medication. (R. at 297.) Rose reported continued anxiety at times and depression. (R. at 297.) She was cooperative with normal motor movement, normal speech, an anxious mood with a full affect, goal-directed thought process, good insight/judgment, no delusions, suicidal or homicidal ideations or auditory or visual hallucinations. (R. at 297.) Rose was again diagnosed with major depressive disorder and generalized

---

[8] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

Case 2:13-cv-00051-JPJ-PMS   Document 17   Filed 02/25/15   Page 11 of 28   Pageid#: 396

anxiety disorder, and her Celexa and Trazodone dosages were increased. (R. at 297.) She also was prescribed Ativan. (R. at 297.) Rose again saw Dr. Brinker on January 6, 2011, and it was noted that she had improved progress. (R. at 296.) Rose reported doing better, with "good sleep and appetite," as well as improved anxiety. (R. at 296.) She was alert and oriented, cooperative with normal speech, a good mood with a full affect, goal-directed thought process, good insight/judgment and no delusions, suicidal or homicidal ideations or auditory or visual hallucinations. (R. at 296.) Rose was diagnosed with major depressive disorder and generalized anxiety disorder, and she was continued on her medications. (R. at 296.)

On February 8, 2011, Joseph Leizer, Ph.D., a state agency psychologist, completed a PRTF, finding that Rose had no restrictions on activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 73-74.) Leizer also completed a Mental Residual Functional Capacity Assessment, finding that Rose was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to respond appropriately to changes in the work setting. (R. at 75-77.) Leizer found that, despite Rose's anxiety and

12

depression, she had shown steady improvement with treatment, and gross mental status disturbances were not apparent. (R. at 77.) He opined that she should be able to perform the mental demands of simple, unskilled and nonstressful work. (R. at 77.)

On March 4, 2011, Rose returned to Mountain States with reports of increased worries about her son and crying spells. (R. at 295.) She was alert and oriented, cooperative with soft speech, an anxious mood with a full affect, goal-directed thought process, fair insight/judgment and no delusions, suicidal or homicidal ideations or auditory or visual hallucinations. (R. at 295.) Rose's dosage of Ativan was increased. (R. at 295.)

That same day, Dr. Brinker completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) of Rose. (R. at 301-03.) Dr. Brinker concluded that Rose had a limited, but satisfactory, ability to use judgment and to maintain personal appearance. (R. at 301-02.) Dr. Brinker found that Rose had a seriously limited ability to follow work rules, to relate to co-workers, to deal with the public, to interact with supervisors, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 301-02.) Dr. Brinker also concluded that Rose had no useful ability to deal with work stresses, to function independently, to maintain attention/concentration and to understand, remember and carry out detailed and complex job instructions. (R. at 301-02.) Dr. Brinker attributed these limitations to Rose's poor concentration/focus, increased anxiety and preoccupation, noting that she was unable to read a book, feared being in public places and had no hobbies. (R. at 302-03.) Dr. Brinker opined that Rose

would miss more than two workdays monthly due to her impairments or treatment. (R. at 303.)

On January 31, 2011, Rose returned to Weitzman, reporting that her youngest son had been suspended from school. (R. at 307.) Rose stated that this was her biggest worry. (R. at 307.) She reported moderate depression, anxiety and crying spells, mild irritability/anger and increased panic attacks. (R. at 307.) Rose again denied suicidal or homicidal ideations. (R. at 307.) On mental status examination, Rose was depressed and irritable with an anxious affect, intact orientation, slowed thought process, transient paranoia/delusions and fair insight/judgment. (R. at 307.) Weitzman opined that she was maintaining her progress. (R. at 307.) She diagnosed Rose with major depressive disorder, recurrent, moderate; generalized anxiety disorder; and counseling for parent-child problem, unspecified. (R. at 307.) On March 7, 2011, Rose stated that she was doing "ok." (R. at 306.) She noted that her son had returned to school when he was not supposed to, and school authorities wanted to assign him a "behavior aide." (R. at 306.) She endorsed moderate depression and panic attacks and mild anxiety, irritability/anger and crying spells. (R. at 306.) She again denied suicidal or homicidal ideations. (R. at 306.) On mental status examination, Rose was depressed with an anxious affect, intact orientation, slowed thought process, transient paranoia/delusions and fair judgment/insight. (R. at 306.) Weitzman opined that Rose was "doing ok" with her progress/treatment goals. (R. at 306.) She diagnosed major depressive disorder, recurrent, moderate; social phobia; and generalized anxiety disorder. (R. at 306.) Rose returned for counseling on April 7, 2011, noting better sleep and feeling better with Trazodone. (R. at 305.) She reported sadness about the death of her sons' father. (R. at 305.) Rose endorsed moderate depression, anxiety, irritability/anger, crying spells and panic attacks, but

denied suicidal or homicidal ideations. (R. at 305.) On mental status examination, she was depressed and irritable with an anxious affect, intact orientation, slowed thought process, transient paranoia/delusions and fair judgment/insight. (R. at 305.) Weitzman noted that Rose was coping better. (R. at 305.) She diagnosed major depressive disorder, recurrent, moderate; generalized anxiety disorder; and agoraphobia with panic disorder. (R. at 305.) On May 5, 2011, Rose reported that her younger son was in trouble at school again, which made her more nervous. (R. at 304.) Rose reported increased depression. (R. at 304.) She endorsed moderate depression, anxiety, crying spells and panic attacks and mild irritability/anger, but she denied suicidal or homicidal ideations. (R. at 304.) On mental status examination, Rose was depressed with an anxious affect, intact orientation and thought process, transient paranoia/delusions and fair judgment/insight. (R. at 304.) Weitzman noted that Rose was decompensating with stress. (R. at 304.) She diagnosed major depressive disorder, recurrent, moderate; generalized anxiety disorder; agoraphobia with panic disorder; and counseling for parent-child problem, unspecified. (R. at 304.)

On August 25, 2011, Weitzman completed another Medical Assessment Of Ability To Do Work-Related Activities (Mental) of Rose, finding that she had a seriously limited ability to maintain personal appearance and no useful ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out simple, detailed and complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 308-10.) She opined that Rose would be absent more than two workdays monthly. (R. at 310.)

Case 2:13-cv-00051-JPJ-PMS   Document 17   Filed 02/25/15   Page 15 of 28   Pageid#: 400

Rose saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on November 1, 2011, for a psychological evaluation at her attorney's referral. (R. at 315-24.) Rose reported that she had been prescribed multiple psychotropic medications, which had helped her, but that she had stopped receiving psychiatric and psychotherapeutic assistance when she lost her insurance. (R. at 315.) Lanthorn conducted a mental status evaluation and administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), and the Minnesota Multiphasic Personality Inventory – Second Edition, ("MMPI-2"). (R. at 316, 318-22.) Lanthorn noted Rose's past psychiatric treatment and diagnoses, including major depressive disorder, recurrent, moderate; generalized anxiety disorder; panic disorder with agoraphobia; and social phobia. (R. at 318.) Rose reported doing laundry, cooking, cleaning and going to the grocery store on occasion with her son. (R. at 318.) She also reported attending church infrequently, socializing with her sons and one friend and watching some television. (R. at 318.) She stated that she enjoyed reading. (R. at 318.)

On mental status examination, Rose exhibited no signs of ongoing psychotic processes or delusional thinking, and she denied having hallucinations. (R. at 319.) Her affect was described as a combination of anxiety and depression. (R. at 319.) Rose exhibited a mild tremulousness to her hands, and she appeared on edge and tense throughout the interview. (R. at 319.) Lanthorn stated that Rose appeared to be "almost consumed" with concerns about her boys and their well-being. (R. at 319.) She had very low self-esteem and made numerous self-critical comments during the interview. (R. at 319.) Rose reported having been depressed for many years. (R. at 319.) She stated that Celexa was helpful to her, but she could no longer afford it without insurance. (R. at 319.) She indicated that she often cried and thought often about dying. (R. at 319.) Rose indicated that she often forgot

things, her mind wandered, and it was difficult for her to finish tasks. (R. at 319.) Lanthorn stated that it was difficult for Rose to articulate her thoughts effectively. (R. at 319.) Rose reported that she no longer had panic attacks on a regular basis. (R. at 319.)

Lanthorn administered the WAIS-IV, the results of which he deemed valid, and on which Rose achieved a full-scale IQ score of 80, placing her in the low average range of intellectual functioning. (R. at 320.) Rose also generated a valid profile on the MMPI-2, which reflected the probability of serious psychological and emotional problems often characteristic of severe and chronic difficulties. (R. at 321.) Her results indicated that she was very depressed and anxious. (R. at 321-22.) Lanthorn noted that Rose's psychopathology was serious enough that her test results indicated she was likely to have frequently confused thinking, difficulty in logic and concentration, as well as impaired judgment. (R. at 322.) Her test results also reflected that she had a very hard time concentrating and keeping her mind on a task or job. (R. at 322.) Rose's judgment was noted to likely be poor, and she likely would display significant memory problems. (R. at 322.) He noted that she was easily embarrassed and generally disliked being around others, finding it difficult to talk with people with whom she did not know. (R. at 322.)

Lanthorn found Rose's allegations of psychologically disabling conditions fully credible, and he deemed her prognosis to be somewhat guarded given the longevity and complexity of her psychological difficulties. (R. at 323.) He strongly encouraged her to resume both psychiatric and psychotherapeutic intervention as soon as she could. (R. at 323.) Lanthorn opined that Rose's difficulties presented moderate to severe limitations in her sustaining gainful employment in virtually any setting. (R. at 324.) He diagnosed her with major depressive disorder,

recurrent, moderate; generalized anxiety disorder; social phobia; borderline intellectual functioning; parent-child relational problem; and personality disorder, not otherwise specified; and he placed her then-current GAF score at 50. (R. at 323.)

Lanthorn also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), finding that Rose had a more than satisfactory ability to understand, remember and carry out simple job instructions, a seriously limited ability to follow work rules, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed job instructions, to maintain personal appearance and to behave in an emotionally stable manner and no useful ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to understand, remember and carry out complex job instructions, to relate predictably in social situations and to demonstrate reliability. (R. at 311-13.) Lanthorn based these findings on Rose's diagnoses of major depressive disorder, recurrent, moderate; generalized anxiety disorder; social phobia; borderline intellectual functioning; parent-child relational problem; and personality disorder; and he referred to his extensive psychological evaluation of Rose. (R. at 311-13.) Lanthorn further opined that Rose would miss, on average, more than two workdays monthly due to her impairments or treatment. (R. at 313.)

On November 14, 2011, Rose saw Stacey Gipe, a physician's assistant at Appalachian Healthcare Associates, to establish care. (R. at 325-26.) Her only complaints were left knee and hip pain. (R. at 325.) Rose reported that she had not taken any medications in four months due to having lost her insurance, but prior to that, she was taking Celexa, Trazodone and Ativan. (R. at 325.) She reported

cleaning houses and babysitting sometimes. (R. at 325.) Rose reported a lot of trouble with anxiety and "nerves." (R. at 326.) Gipe planned to restart Celexa, among other medications. (R. at 326.) Rose returned to Gipe on December 27, 2011, noting that she had been under a great deal of stress and had been unable to get her medications. (R. at 327.) She was diagnosed with anxiety and depression, among other things, and Gipe sent Rose's prescriptions to Walmart, where she could get them filled for only $4.00. (R. at 327.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2014).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 &

Supp. 2014); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Rose argues that the ALJ made incomplete findings at step three of the sequential evaluation process. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) She also argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Brief at 5-8.) More specifically, she argues that the ALJ erred by rejecting the opinions of Dr. Brinker, psychologist Lanthorn and licensed clinical social worker Weitzman. (Plaintiff's Brief at 7-8.) As noted above, Rose does not challenge the ALJ's findings as to her physical impairments or her physical residual functional capacity.

First, I am not persuaded by Rose's argument that the ALJ made incomplete findings at step three of the sequential evaluation process. At step three, the ALJ must have considered whether Rose had an impairment that met or equaled the requirements of a listed impairment. *See* 20 C.F.R. § 416.920. The Commissioner correctly states in her brief that a mere diagnosis of a listed impairment alone is not sufficient to find that the claimant's impairment meets or equals the requirements of a listed impairment for a finding of disability. Instead, the impairment must meet all of the criteria set forth in the listed impairment. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Additionally, the plaintiff bears the burden of proving that her impairments are disabling at step three of the sequential evaluation process. *See Smith v. Heckler*, 782 F.2d 1176 (4th Cir. 1986).

Rose concedes that the ALJ, in evaluating whether her impairments met or equaled any mental listings, considered whether the "paragraph B" criteria were

satisfied.[9] In this regard, the ALJ found that Rose was only mildly restricted in her activities of daily living and moderately restricted in maintaining social functioning and in maintaining concentration, persistence or pace. Rose contends that, although the ALJ stated that he would discuss these areas of functioning in further detail in the analysis that followed, he did not do so, thereby failing to provide any support or explanation for these conclusions. She argues that, without such an explanation, a meaningful review of the decision is precluded.

In the decision, the ALJ considered Rose's impairments under multiple mental listings.[10] The ALJ supported his conclusion that the "paragraph B" criteria were not satisfied with multiple sources, including Rose's testimony, objective treatment notes and other medical evidence. For instance, the ALJ noted Rose's statement and treatment records stating that she cared for her son and was able to perform a wide range of activities of daily living, to include dusting, mopping, washing dishes, cooking, watching television and reading for pleasure. (R. at 20, 33, 40-41, 47, 156-58.) The ALJ also noted that Rose went grocery shopping with her son, attended church on occasion and went out with a friend on weekends. (R. at 20, 40-41, 43, 51, 159.) As for social functioning, the ALJ identified treatment notes and testimony indicating that, contrary to Rose's allegations of a fear of being in public, she attended church on occasion, socialized with her sons and went to movie theaters and restaurants with a friend on a routine basis. (R. at 18-20, 34,

---

[9] In order to satisfy the "paragraph B" criteria, a claimant's mental impairments must result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. §§ 12.04(B), 12.05(D), 12.06(B), 12.08(B) (2014).

[10] The ALJ considered whether Rose's impairments met or equaled the criteria for § 12.04, the listing for affective disorders, § 12.05, the listing for mental retardation, § 12.06, the listing for anxiety related disorders, and § 12.08, the listing for personality disorders.

40-41, 51, 160, 318-19.) Lastly, with regard to Rose's ability to maintain concentration, persistence or pace, it does not appear that the ALJ specifically addressed this area of functioning. However, his findings regarding the other "paragraph B" criteria, likewise, support this finding. For instance, the ALJ's findings that various treatment notes do not support the severe functional limitations imposed, that Rose underwent only conservative treatment with counseling and medication management and that Rose's activities of daily living, including housework, caring for a son with Asperger Syndrome, watching television, reading on occasion, attending church occasionally and going to movies and restaurants with a friend on a routine basis, support his finding that Rose suffered no more than moderate limitations in maintaining concentration, persistence or pace.

Given these rather specific findings regarding the "paragraph B" criteria, I find that Rose's argument that the ALJ made incomplete findings at step three of the sequential evaluation process is without merit. For the reasons that follow, I, likewise, find her argument that the ALJ erred by improperly determining her residual functional capacity unpersuasive.

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the

ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(c)(2) (2014). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to reject the opinions of two treating mental health sources, Weitzman and Dr. Brinker, as well as consultative examiner Lanthorn. The ALJ found the opinions of all three of these sources to be inconsistent with Rose's treatment records, inconsistent with credible medical evidence and offered without any basis or explanation. (R. at 20.) Weitzman assessed severe functional limitations in her opinion, which are not supported by Rose's allegations or Weitzman's own treatment notes. For instance, Weitzman's treatment notes reflect that Rose consistently endorsed no more than "moderate" symptoms and, at times, "mild" symptoms. (R. at 235, 283-90, 304-07.) Further, Weitzman's treatment notes reveal that Rose had fair judgment/insight and intact thought process. (R. at 234-35, 285, 306.) These notes also reflect continued improvement in Rose's condition. (R. at 235, 285, 305.) Next, although Weitzman assigned severe limitations in Rose's abilities to follow instructions and to interact within a work environment, her treatment notes neither reflect that such functional areas were specifically considered, nor include findings from which to infer that the imposition of such severe limitations was justified. Finally, Weitzman failed to provide any evidence supporting the imposition of such severe limitations on the assessments themselves.

Dr. Brinker's opinion also is contrary to her own treatment notes and the other medical evidence of record. Dr. Brinker opined that Rose had either a seriously limited or no useful ability in nearly all areas of occupational, performance and personal/social adjustments. However, her treatment notes indicate that Rose consistently was cooperative and exhibited goal-directed thought process and fair or good insight/judgment. (R. at 295-97, 299.) When Rose initially saw Dr. Brinker in October 2010, Dr. Brinker assessed her GAF score at 60,

24

indicating only moderate symptoms, and she deemed her prognosis as good. (R. at 300.) By December 2010, Rose reported anxiety only "at times." (R. at 297.) In January 2011, Dr. Brinker noted that Rose had improved progress, and Rose reported doing "better." (R. at 296.) Additionally, Dr. Brinker's treatment notes reflect that she treated Rose conservatively with medications, and that, while Rose initially was instructed to return for treatment at one-month intervals, by January 2011, she was instructed to return in two months' time. (R. at 296.)

Lastly, the ALJ considered the opinion offered by consultative psychological examiner Lanthorn. (R. at 19.) Lanthorn opined that Rose had a seriously limited ability to follow work rules, to deal with work stresses, to function independently and to maintain attention and concentration, among other things. Lanthorn also opined that Rose had no useful ability to relate to co-workers, to deal with the public and to use judgment, among other things. Lanthorn's findings are contradicted by Rose's statements, as noted above, her activities of daily living, also noted above, and the other medical evidence of record. For instance, as stated herein, Dr. Brinker's treatment notes demonstrate that Rose's symptoms improved over time with only conservative treatment. Moreover, there is no evidence in the record, nor does Rose contend, that she ever sought or received any emergent psychiatric treatment, even during the time that she was without insurance and was unmedicated. Additionally, Rose has admitted on multiple occasions that medications helped to improve her symptoms. (R. at 38, 315, 319.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1991). Lanthorn's notes also indicate that Rose was well-oriented and could care for herself, her son and her home. (R. at 318.) She advised Lanthorn that she enjoyed socializing with a friend. (R. at 318.)

In his decision, the ALJ accepted the opinions of the state agency psychologists, who opined that Rose had no more than moderate difficulties in performing some work-related mental abilities and who concluded that she should be able to perform simple, unskilled routine work. For the reasons stated herein, these opinions are supported by the evidence of record as a whole.

It is for all of these reasons that I find that substantial evidence supports the ALJ's weighing of the psychological evidence. That being so, I further find that substantial evidence supports the ALJ's finding as to Rose's mental residual functional capacity and his finding that she was not disabled.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the psychological evidence;

2. Substantial evidence exists in the record to support the ALJ's finding with regard to Rose's residual functional capacity; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Rose was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Rose's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2014):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     February 25, 2015.

_s/ Pamela Meade Sargent_
UNITED STATES MAGISTRATE JUDGE